UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MARTIN GERBER, ADMINISTRATOR OF
THE ESTATE OF PHYLLIS GERBER, on
behalf of the decedent and all others similarly
situated,

        *Plaintiff,*

v.

PHREESIA, INC.,

        *Defendant.*

———————————————————— x

Case No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Martin Gerber, Administrator of the Estate of Phyllis Gerber ("Plaintiff"), on behalf of the decedent and all others similarly situated, alleges the following Class Action Complaint (the "Action") against the above-captioned Defendant, Phreesia, Inc. ("Defendant"), upon information and belief, including the investigation of counsel, as follows:

## I.    INTRODUCTION

1. Defendant is a publicly traded software as a service ("SAAS") company which offers doctors and large healthcare organizations a set of applications to manage medical patient intake.

2. One of the products Defendant offers to healthcare providers, which they acquired from ConnectOnCall.com, LLC ("ConnectOnCall") in October 2023, is an improvement to the providers' after-hours call processes and enhancement to the communications between the providers and their patients.

3.      In the course of serving patients across the country, ConnectOnCall.com collected a significant amount of data, including patients' personal identifiable information, legal name, demographic data, and protected health information (collectively, "PII").

4.      This  PII was exposed for Plaintiff and the Class members.

5.      When patients, like Plaintiff, initially disclosed their PII to Defendant, they did so under the impression that it would be protected in a manner consistent with how valuable this subset of PII is.

6.      However, between February 16, 2024 and May 12, 2024, unknown individuals gained access to ConnectOnCall's servers and acquired a significant amount of patient data, including that of Plaintiff and Class members.  Those same individuals also deployed the use of ransomware, which allowed them to gain control over ConnectOnCall's servers and lock Defendant out from accessing ConnectOnCall's valuable patient data (collectively, the "Data Breach").

7.      Defendant's response to the Data Breach was woefully sufficient: (1) Defendant took over ten months to notify individuals that their data was breached, resulting in Plaintiff and Class Members being unaware for over ten months that their PII was exposed; (2) Defendant failed to explain precisely how the Data Breach occurred; (3) Defendant failed to explain the measures being taken to prevent their PII from being exposed  once again; and (4) Defendant failed to offer any sort of immediate compensation (including identity theft protection) for the harm caused by their inadequate cybersecurity protections.

8.      Due to this conduct, Plaintiff and Class members have been exposed to actual harm consistent with the litany of injuries that data breaches cause, including (a) loss of value of PII, (b) loss of time spent dealing with the Data Breach (here, by the decedent's family members, including

her son), (c) imminent threat of and actual theft of PII by cybercriminals, and (d) any other types of quantifiable harm that stem from the breach, including out-of-pocket losses and money spent on identity theft monitoring.

9.    As such, Plaintiff and all other similarly situated, bring this Action seeking actual damages, punitive damages, restitution, statutory damages, injunctive relief, and a declaratory judgment, as well as any other relief this Court may deem just and proper, for Defendant's negligence/negligence *per se*, breach of implied contract, violations of New York General Business Law §349, and unjust enrichment.

10.    Additionally, given the scope of sensitive data compromised by Defendant, coupled with Defendant's failure to offer no immediate credit monitoring to protect and remediate the harm caused by Defendant's violations of law, Plaintiff and Class members seek at least three years of identity theft protection and credit monitoring.

## II.    JURISDICTION AND VENUE

11.    ***Subject Matter Jurisdiction.***    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).    The amount of controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are more than 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than Defendant. Additionally, the CAFA Home-State Exception does not apply because more than one third of putative Class members are from states other than New York.

12.    ***Personal Jurisdiction.***    This Court has personal jurisdiction over Defendant because Defendant intentionally availed itself of this jurisdiction by marketing, employing

individuals, and providing services in New York, New York.  Further, Plaintiff was domiciled in this jurisdiction such that the harm caused by Defendant occurred here.

13.    *Venue.*  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant operates in this District and a substantial part of the events, acts and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

### Plaintiff Martin Gerber, Administrator of The Estate of Phyllis Gerber

14.    Plaintiff Gerber was a resident and citizen of the State of New York in Melville, New York.

### Defendant Phreesia, Inc.

15.    Defendant Phreesia, Inc. is a Delaware corporation with its principal place of business located in Wilmington, Delaware.

## IV.    FACTUAL ALLEGATIONS

### Defendant's Business

16.    Phreesia, Inc. is a publicly-traded healthcare corporation that services the entirety of the United States.  According to Phreesia, Inc's annual filings with the United States Securities and Exchange Commission ("SEC"):

> We are a leading provider of comprehensive software solutions that improve the operational and financial performance of healthcare organizations and improve health outcomes by helping patients take a more active role in their care. Our solutions include SaaS-based integrated tools that manage patient access, registration and payments. We have tools to communicate with patients about their health and have demonstrated increased rates of preventive care and vaccinations. Additionally, our solutions include clinical assessments to screen patients for a variety of physical, behavioral and mental health conditions, helping providers to better understand their patients and connect them to needed services, resulting in improved health outcomes. We also provide life sciences companies, health plans and other payer organizations (payers), patient advocacy, public interest and other not-for-profit organizations with a channel for direct communication with patients.

3

Our solutions also include additional products and services such as the MediFind provider directory, which helps patients find care based on providers' specific clinical expertise. In fiscal 2024, we facilitated patient visits in over 3,900 healthcare services clients across all 50 states. We define a patient visit as an individual, in-person or telehealth visit to a healthcare services provider, which may include multiple encounters by the same patient.

17.     In the ordinary course of providing health care services, providers and patients are required to provide, at a minimum, the PII, which is the data set of information compromised in this Data Breach, as previously stated, includes legal name, demographic data, and protected health information.

18.     Indeed, prior to receiving care and treatment from her healthcare providers, Plaintiff was required to and did in fact turn over much (if not all) of the private and confidential information listed above.

19.     Additionally, with respect to medical care and protected health information, Defendant may receive private and personal information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, patients' other doctors, patient's health plan(s), close friends, and/or family members.

20.     Defendant also likely creates and maintains a considerable amount of PHI in the course of providing medical care and treatment, as well as PII in employment records – which were comingled with patient data in the Data Breach.

21.     Defendant, as ConnectOnCall did, promises to maintain the confidentiality of patients' health and non-public personal information, ensure compliance with federal and state laws and regulations, and not to use or disclose patients' health information for any reasons other than those expressly listed in the Privacy Policy without written authorization.

22.    As a condition of receiving related medical and other services from Defendant, Defendant requires that its patients and providers entrust it with highly sensitive personal information.

23.    By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

24.    Class Members have taken reasonable steps to maintain the confidentiality of their PII.

25.    Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for employment, business and health purposes only, and to make only authorized disclosures of this information.

### *The Data Breach*

26.    On or about May 15, 2024, Defendant posted the following message on its website regarding the Data Breach, stating:

**ConnectOnCall Security Incident Update**

**Posted on May 15**

On May 12, 2024, Phreesia learned of a service disruption to ConnectOnCall, a subsidiary Phreesia acquired in October 2023. While investigating this matter, we determined that a cybercriminal had gained access to ConnectOnCall.

The ConnectOnCall service remains offline, and we are working diligently to assess the potential impact and restore the service. We have engaged with law enforcement, and we are working with a third-party cybersecurity firm and other experts to support our investigation.

The ConnectOnCall service is separate from Phreesia's other services, including our patient intake platform. Based on our investigation to date, there is no evidence that our other services have been affected. We understand the importance of this

service to our clients' business, and we are working to restore the ConnectOnCall service as quickly as possible.

We have notified ConnectOnCall and Phreesia customers regarding this matter. For any questions, please contact us at **privacy@phreesia.com**.

Additionally, as of this time, the incident has not had a material impact on our overall business operations, nor do we believe the incident is likely to have a material impact, based on our investigation to date and our current understanding that this incident is limited to the ConnectOnCall service.

27.     On or about December 11, 2024, over ten months after the initial breach took place,

the Defendant disseminated a Notice of Data Breach (the "Notice").  The Notice states:

### Notice of Data Breach

ConnectOnCall.com, LLC provides a product ("ConnectOnCall") that healthcare providers purchase to improve their after-hours call process and enhance communications between the providers and their patients. I am writing to inform you about an incident that involved personal information about you relating to your communications with a healthcare provider that uses ConnectOnCall. We regret that this incident occurred and take the security of personal information seriously. We are sending you this correspondence to tell you what happened, what information was involved, what we have done, and what you can do to address this situation.

WHAT HAPPENED. On May 12, 2024, we learned of an issue impacting ConnectOnCall. As soon as we learned of the incident, we immediately began an investigation and took steps to secure the product and ensure the overall security of our environment. Our investigation revealed that between February 16, 2024, and May 12, 2024, an unknown third party had access to ConnectOnCall and certain data within the application, including certain information in provider-patient communications.

WHAT INFORMATION WAS INVOLVED. You are receiving this notice because you or your family member, health advocate, or healthcare provider provided your information in a patient-provider message using ConnectOnCall.
We have determined that the personal information involved in this incident may have included your name, phone number, and information related to your health conditions, treatments, or prescriptions.

WHAT WE ARE DOING. We engaged external cybersecurity specialists to determine the full nature and scope of the incident, identify any impacted information, and help us enhance our security controls to mitigate the risk of future security incidents. Also, after becoming aware of the incident, we took the

ConnectOnCall product offline and have been working through a phased restoration of the product in a new, more secure environment. We also notified federal law enforcement of the incident.

WHAT YOU CAN DO. Consistent with certain laws, we are providing you with the following information about steps that a consumer can take to protect against potential misuse of personal information.
You should always remain vigilant for incidents of fraud and identity theft, including by regularly reviewing your account statements and monitoring credit reports. If you discover any suspicious or unusual activity on your accounts or suspect identity theft or fraud, be sure to report it immediately to your financial institutions.

In addition, you may contact the Federal Trade Commission ("FTC") or law enforcement, including your state Attorney General, to report incidents of identity theft or to learn about steps you can take to protect yourself from identity theft. To learn more, you can go to the FTC's website at www.ftc.gov/idtheft, or call the FTC at (877) IDTHEFT (438-4338) or write to Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580.

28.    The Notice related to this Data Breach raises more questions than it answers.

29.    According to Defendant, Defendant first detected unusual activity on its servers on May 12, 2024 – however, the cybercriminals had access to the Defendant's network as early as February 16, 2024.  This means that for months, cybercriminals gained access to and remained able to collect data and other information from Defendant's servers undetected.  This illuminates Defendant's unacceptable monitoring and other cybersecurity measures related to its network; this failure to detect these intrusions was punctuated by a complete loss of access to ConnectOnCall's data sets.

30.    Defendant's response to the Data Breach was woefully sufficient: (1) Defendant took over ten months to individually notify individuals that their data was breached, this means that for over ten months Class members had no knowledge that their PII was exposed; (2) Defendant failed to explain precisely how the Data Breach occurred and the measures being taken to prevent the same PII from falling into the hands of cybercriminals once again; and (3) Defendant

fails to offer any sort of immediate compensation (including identity theft protection) for the harm caused by their inadequate cybersecurity protections.

31.     Defendant's omissions within the Notice are also important: Defendant fails to describe precisely how the unauthorized actors initially gained and maintained access, why Defendant failed to detect the intrusion(s) of these unauthorized actors, and specifically how Defendant intends to avoid making these types of incidents from happening again.  These critical points remain unclear.

32.     But what's clear from the Notice is that cybercriminals did, in fact, access and view Plaintiff's and Class members' PII and PHI during the time period in which the cybercriminals had unfettered access to Defendant's IT network, as that is the modus operandi of cybercriminals who commit such attacks.

33.     Simply, Defendant could have prevented this Data Breach.

34.     Defendant did not implement or maintain adequate measures to protect its current and former patients' PII and PHI.

35.     On information and belief, the PII and PHI compromised in the files accessed by hackers was not encrypted – this can be presumed given the hackers were able to access the data that was stated as compromised in the Notice.

36.     Moreover, the removal of PHI and other PII and PHI from Defendant's system demonstrates that this cyberattack was targeted due to Defendant's status as a healthcare facility that houses sensitive PII and PHI of patients.

37.     Due to Defendant's incompetent security measures and their incompetent response to the Data Breach, Plaintiff and Class members now face a present and substantial risk of fraud and identity theft and must deal with that threat forever.

38.     Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of PII and PHI, the sophistication of Defendant, and the fact that Defendant is well aware of the risks of healthcare data breaches, Defendant provided unreasonably deficient protections prior to the Breach, including, but not limited to a lack of security measures for storing and handling patients' PII and PHI and inadequate employee training regarding how to access, handle and safeguard this information.

39.     This could have only occurred because Defendant failed to adequately adopt and train its employees on even the most basic of information security protocols, including: storing, locking encrypting and limiting access to current and former patients' highly sensitive PHI; implementing guidelines for accessing, maintaining and communicating sensitive PHI, and protecting sensitive PHI by implementing protocols on how to utilize such information.

40.     Defendant's failures caused the unpermitted disclosure of Plaintiff's and Class members' PII to an unauthorized third party and put Plaintiff and the Class at serious, immediate and continuous risk of identity theft and fraud.

41.     The Data Breach that exposed Plaintiff's and Class members' PHI was caused by Defendant's violation of its obligations to abide by best practices and industry standards concerning its information security practices and processes.

42.     Defendant failed to comply with security standards or to implement security measures that could have prevented or mitigated the Breach.

43.     Defendant failed to ensure that all personnel with access to its patients' PII and PHI were properly trained in retrieving, handling, using and distributing sensitive information.

### *The Breach Was Entirely Foreseeable*

44.     Defendant had obligations created by HIPAA, industry standards, common law and its own promises and representations made to Plaintiff and Class Members to keep their PII and PHI confidential and to protect it from unauthorized access and disclosure.

45.     Plaintiff and Class members provided their PII and PHI to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

46.     Defendant's data security obligations were particularly important given the substantial increase in ransomware attacks and/or data breaches in the healthcare industry preceding the date of the breach.

47.     Data breaches, including those perpetrated against the healthcare sector of the economy, have become extremely widespread.

48.     Defendant's data security obligations were particularly important given the substantial increase in ransomware attacks and/or data breaches in the healthcare industry preceding the date of the Data Breach.

49.     Data breaches, including those perpetrated against the healthcare sector of the economy, have become widespread.  Not surprisingly, healthcare is by far the most affected industry sector by data breaches and ransomware incidents.  According to HIPAA statistics, between 2009 and 2022, 5,150 healthcare data breaches of 500 victims or more occurred.  And, of those breaches, the impermissible disclosure of 382,262,109 healthcare records occurred.  The rate of healthcare-related data breaches have also accelerated, with an average of approximately one large (500 victims or more) healthcare-related data breach per day in 2018 as compared to nearly two such data breaches per day in 2022.  In 2023 alone, there were many large healthcare-related

data breaches with tens of millions of victims including the MOVEit data breaches (tens of millions of victims across multiple data breaches), HCA Healthcare (11,270,000 victims), Perry Johnson & Associates (11,000,000+ victims), MCNA Dental (8,861,076 victims), and others.  As such, Defendant was aware of the risk of data breaches because such breaches have dominated the headlines recently.

50.    There is substantial evidence that data breaches in the healthcare sector harm patient outcomes.  According to a 2019 Cornell University study titled "Do Hospital Data Breaches Reduce Patient Care Quality," "[h]ospital data breaches significant increase … mortality rate[.] Data breaches may disrupt the processes of care that rely on health information technology. Financial costs to repair a breach may also divert resources away from patient care.  Thus, breached hospitals should carefully focus investments in security procedures, processes, and health information technology that jointly lead to better data security and improved patient outcomes."

51.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

52.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.

53.    As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

54.     According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations. Significant security incidents are a near-universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors, leveraging e-mail as a means to compromise the integrity of their targets."

55.     PII and PHI is of great value to hackers and cybercriminals, and the data compromised in the Breach can be used in a variety of unlawful manners.

56.     PII and PHI can be used to distinguish, identify or trace an individual's identity, such as their name and medical records.

57.     This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace and mother's maiden name.

58.     Given the nature of this Data Breach, it is foreseeable that the compromised PII and PHI can be used by hackers and cybercriminals in a variety of different ways.

59.     Indeed, the cybercriminals who possess the Class members' PII and PHI can readily obtain Class members' tax returns or open fraudulent credit card accounts in the Class members' names.

60.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including, upon information and good faith belief, to the Defendant.

### *Defendant Failed to Follow FTC Guidelines*

61.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

62.     According to the FTC, the need for data security should be factored into all business decision-making.

63.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

64.     The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

65.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.    These FTC enforcement actions include actions against healthcare providers like Defendant. See, e.g., *In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

69.    Defendant failed to properly implement basic data security practices.

70.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71.    Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Failed to Meet Industry Standards*

72.    As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

73.    Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data.

74.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

75.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

76.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *Defendant Failed to Comply with HIPAA*

77.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

78.     Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI.   Safeguards must include physical, technical, and administrative components.

79.     Title II of HIPAA contains what are known as the Administrative Simplification provisions.   These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI and PII like the data Defendant left unguarded.

80. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D) and 45 C.F.R. § 164.530(b).

> A data breach such as the one Defendant experienced, is also considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule: A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40

81. Data breaches are Security Incidents under HIPAA because they impair both the integrity (data is not interpretable) and availability (data is not accessible) of patient health information:

> The presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule. A security incident is defined as the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. See the definition of security incident at 45 C.F.R. 164.304. Once the ransomware is detected, the covered entity or business associate must initiate its security incident and response and reporting procedures. See 45 C.F.R.164.308(a)(6).

82. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

### ***Defendant's Breach***

83. Defendant breached its obligations to Plaintiff and the Class members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems, network and data.

84. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.  Failing to adequately protect consumers' PHI and other PII and PHI;

c.  Failing to properly monitor its own data security systems for existing intrusions, brute-force attempts and clearing of event logs;

d.  Failing to apply all available and necessary security updates;

e.  Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

f.  Failing to practice the principle of least-privilege and maintain credential hygiene; Failing to avoid the use of domain-wide, admin-level service accounts;

g.  Failing to employ or enforce the use of strong randomized, just-in-time local administrator passwords;

h.  Failing to properly train and supervise employees in the proper handling of inbound emails;

i.  Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

j.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

k.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

l.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

m.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

n.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

o.  Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

p.  Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b) and/or;

q.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key," 45 CFR § 164.304 (definition of encryption).

85.    As the result of allowing its computer systems to fall into dire need of security upgrading and its inadequate procedures for handling cybersecurity threats, Defendant negligently and unlawfully failed to safeguard Plaintiff's and the Class members' PII and PHI.

86.     Accordingly, as outlined below, Plaintiff and Class members now face a substantial, increased, and immediate risk of fraud and identity theft.

### *Data Breaches Are Disruptive and Harm Consumers*

87.     Hacking incidents and data breaches at medical facilities and companies like Defendant are especially problematic because of the disruption they cause to the medical treatment and overall daily lives of patients affected by the attack.

88.     As previously stated, researchers have found that at medical facilities that experienced a data security incident, the death rate among patients increased in the months and years after the attack.

89.     Researchers have further found that at medical facilities that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.

90.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

91.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

92.     They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

93.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.

94.     Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

95.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

96.     Theft of PII and PHI is gravely serious. PII and PHI is an extremely valuable property right.

97.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that PII and PHI has considerable market value.

98.     Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care.  If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

99.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose

of target marketing their products and services to the physical maladies of the data breach victims themselves.   Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

100.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when PII, PHI, and/or financial information is stolen and when it is used.

101.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. See GAO Report, at p. 29.

102.    PII and PHI is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

103.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

104.    Thus, Plaintiff and Class members must vigilantly monitor their financial and medical accounts for many years to come.

105.    Sensitive PII and PHI can sell for as much as $363 per record according to the Infosec Institute.

106.    PII is particularly valuable because criminals can use it to target victims with frauds and scams.

107.    Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

108.    Medical information is especially valuable to identity thieves.

109.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.

110.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

111.    For this reason, Defendant knew or should have known about these dangers and strengthened its network and data security systems accordingly.  Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### ***Harm to Plaintiff***

112.    As a result of the Data Breach, Plaintiff's family, including her son, have made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.  Plaintiff's son has spent several hours dealing with the Data Breach by reviewing medical statements, valuable time Plaintiff's son otherwise would have spent on other activities.

113.    Plaintiff has suffered actual injury from having her PII and PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from Plaintiff; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

114.    As a result of the Data Breach, Plaintiff's son anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.  As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS ALLEGATIONS

115.    This Action is properly maintainable as a Class Action.

116.    Plaintiff brings this Action on behalf of herself and all similarly situated persons for the following Class defined as:

> **Class Definition.** All patients who received a Data Breach notification letter from Defendant who also reside in the United States whose PII and/or PHI was compromised on the Data Breach first announced by the Defendant in May of 2024.

117.    Excluded from the Classes are: Defendant and Defendant's relatives, subsidiaries, affiliates, officers and directors, and any entity in which the Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118.    Plaintiff reserves the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

119.    <u>Numerosity.</u> Defendant reports that the Data Breach compromised PHI of hundreds, if not thousands, of current and former patients as well as employees. Therefore, the members of the Class are so numerous that joinder of all members is impractical.  Indeed, there are over 900,000 victims of this Data Breach.

120. <u>Commonality.</u> There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost or disclosed Plaintiff's and Class Members' PII;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their PII;

f. Whether Defendant breached its duty to Class Members to safeguard their PII;

g. Whether computer hackers obtained Class Members' PII in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

k. Whether Defendant failed to provide notice of the Data Breach in a timely manner and

l. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, equitable relief and/or injunctive relief.

121.    <u>Typicality.</u> Plaintiff's claims are typical of those of other Class members because Plaintiff's PHI, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Defendant's uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

122.    <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, including, but not limited to, similar data breach class action litigation, and Plaintiff intends to prosecute this action vigorously.

123.    <u>Superiority of Class Action.</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

124.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class

members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

125.    Adequate notice can be given to Class members directly using information maintained in Defendant's records.

126.    <u>Predominance.</u> The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

127.    This proposed class action does not present any unique management difficulties.

## **FIRST CAUSE OF ACTION**

### **NEGLIGENCE/NEGLIGENCE PER SE**

128.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

129.    Defendant required Plaintiff and the Class Members to submit non-public personal information in order to obtain medical services.

130.    The Class members are individuals who provided certain PII and PHI to Defendant including, and at a minimum, the PII and PHI described above.

131.    Defendant had full knowledge of the sensitivity of the PII and PHI to which it was entrusted and the types of harm that Class members could and would suffer if the information were wrongfully disclosed.

132.    Defendant had a duty to each Class member to exercise reasonable care in holding, safeguarding and protecting that information.

133.    Plaintiff and the Class members were the foreseeable victims of any inadequate safety and security practices.

134.    The Class members had no ability to protect their data in Defendant's possession.

135.    By collecting and storing this data in its computer property, and by sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and the Class members' PII and PHI held within it — to prevent disclosure of the information and to safeguard the information from theft.

136.    Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

137.    Defendant owed a duty of care to safeguard the PII and PHI of Plaintiff and Class members in its custody.  This duty of care arises because Defendant knew of a foreseeable risk to the data security systems it used.  Defendant knew of this foreseeable risk because of the explosion of data breach incidents involving healthcare providers detailed above. Despite its knowledge of this foreseeable risk, Defendant failed to implement reasonable security measures.

138.    Defendant owed a duty of care to Plaintiff and the Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII and PHI.

139.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its client patients, which is recognized by laws and regulations including, but not limited to, HIPAA, as well as the common law.

140.    Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

141.    Defendant's conduct also rises to the level of negligence *per se*.

142.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

143.    Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

144.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

145.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII and PHI.

146.    Defendant breached its duties, and thus was negligent (as well as negligent *per se*), by failing to use reasonable measures to protect the Class members' PHI and PII.

147.    The specific negligent acts and omissions committed by Defendant includes, but are not limited to, the following:

a. Failing to adopt, implement and maintain adequate security measures to safeguard Class members' PII and PHI;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to periodically ensure that their network system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class members' PII and PHI;

e. Failing to detect in a timely manner that Class members' PII and PHI had been compromised;

f. Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages and

g. Failing to have mitigation and back-up plans in place in the event of a cyber- attack and data breach.

148.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' PII and PHI would result in injury to Plaintiff and Class members.

149.    Further, the breach of security was reasonably foreseeable given the known high frequency of hacking incidents, cyberattacks, and data breaches in the healthcare industry.

150.    It was therefore foreseeable that the failure to adequately safeguard Class members' PII and PHI would result in one or more types of injuries to Class members.

151.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

152.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures and (iii) provide adequate credit monitoring to all Class members.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED CONTRACT

153.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

154.    Defendant provides medical treatment and care to Plaintiff and Class members. Defendant formed an implied contract with Plaintiff and Class members through their collective

conduct.

155.    Through Defendant's provision of services, it knew or should have known that it must protect Plaintiff's and Class members' confidential PII and PHI in accordance with Defendant's stated policies, practices and applicable law.

156.    As consideration, Plaintiff and Class members turned over valuable PII and PHI in exchange for either medical services or care.

157.    Defendant accepted possession of Plaintiff's and Class members' PII and PHI for the purpose of providing services to Plaintiff and the Class members.  In delivering their PII and PHI to Defendant, Plaintiff and the Class members intended and understood that Defendant would adequately safeguard the PII as part of the provision or receipt of those services.

158.    Defendant's implied promises to Plaintiff and Class members include, but are not limited to Defendant: (1) taking steps to ensure that anyone who is granted access to PII and PHI also protects the confidentiality of that data; (2) taking steps to ensure that the PII and PHI placed in control of Defendant's employees is restricted and limited only to achieve authorized business purposes; (3) restricting access to employees and/or agents who are qualified and trained; (4) designing and implementing appropriate retention policies to protect PII and PHI; (5) applying or requiring proper encryption and/or the separation of different data sets; (6) implementing multifactor authentication for access; and (7) taking other steps to protected against foreseeable breaches.

159.    Plaintiff and Class members would not have entrusted their PII and PHI to Defendant in the absence of such an implied contract.

160.    Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class members' PII and PHI.

161.    Plaintiff and Class members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiff seeks damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

162.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

163.    Plaintiff and the Class Members are consumers as defined by the statute because they received services from a New York-based Defendant, their data was collected by a New York-based Defendant, and the harm caused to them was due to the poor decision-making and negligent conduct of a New York-based Defendant.

164.    Defendant engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law 349, including:

   a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Class Members PII and PHI, which was a proximate and direct cause of the Data Breach;

   b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Class Members' PHI and PII, including by implementing and maintaining reasonable security measures;

d.  Failing to timely and adequately notify the Plaintiff and Class Members of the Data Breach;

e.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Class Members' PII and PHI; and

f.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505.

165.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of PII and PHI.

166.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

167.  Defendant acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff and Class Members' rights.

168.  As a direct and proximate result of Defendant's deceptive and unlawful acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII and PHI.

169.  Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large.

170.    The above deceptive and unlawful practices and acts by Defendant caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid.

171.    Plaintiff and Class Members paid a price higher for medical services that they ordinarily would not have due to the cost of Defendant's ineffective cybersecurity apparatus and protocols.  This premium pricing was not justified, as the Data Breach reveals.

172.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT

173.    Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

174.    This Count is alternatively pled to Count III, Breach of Implied Contract.

175.    Plaintiff and Class Members conferred a benefit on Defendant with their money or labor services.  Specifically, they purchased goods and services from Defendant and/or provided their labor and in so doing also provided Defendant with their PII and PHI. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and should have had their PII and PHI protected with adequate data security.

176.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

177.    In particular, the Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

178.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

179.    Defendant failed to secure Plaintiff's and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

180.    Defendant acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

181.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

182.    Plaintiff and Class Members have no adequate remedy at law.

183.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their PII and PHI is used; (c) the compromise, publication, and/or theft of their PII and PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and PHI; (e) lost

opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and PHI in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

184.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

185.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## VI.    PRAYER FOR RELIEF

186.    WHEREFORE, Plaintiff, on behalf of her estate, and behalf of all others similarly situated, pray for relief as follows:

A.    For an Order certifying this case as a class action and appointing Plaintiff's estate and her counsel to represent the Class;

B.    For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined, as allowable by law;

C. For an award of damages, equitable, and injunctive relief, as well as reasonable attorneys' fees and costs, on behalf of themselves and the Class.

D. For an award of punitive damages, as allowable by law;

E. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiff and the class which remains in Defendant's possession.

F. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

G. Pre- and post-judgment interest on any amounts awarded; and

H. Such other and further relief as the Court may deem just and proper.

## VII.    JURY TRIAL DEMAND

187.    Plaintiff hereby demands a trial by jury of all claims so triable.

[*The Remainder of this Page is Intentionally Left Blank*]

**DATED:** December 16, 2024

Respectfully Submitted,

/s/ *Jason P. Sultzer*

Jason P. Sultzer
Scott E. Silberfein
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
*sultzerj@thesultzerlawgroup.com*
*silberfeins@thesultzerlawgroup.com*

Jeffrey K. Brown
Blake Hunter Yagman
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550
*jbrown@leedsbrownlaw.com*
*byagman@leedsbrownlaw.com*